Robert SCHISLER, Mary Micelli, Paulette Beard, Frank Powroznik, Rose Reese, Harry Delandro, Marjorie Hilts, Cinda Coleman, Rose Mitchell and Kathran Tennant, On Behalf of Themselves and All Other Individuals Similarly Situated, Plaintiffs,

v.

Margaret M. HECKLER [1], as Secretary of the United States Department of Health and Human Services; Barbara Blum, as Commissioner of the New York State Department of Social Services, and Sidney Houben, as Director of Social Services Bureau of Disability Determinations, Defendants.

No. CIV–80–572.

United States District Court, W.D. New York.

Nov. 18, 1983.

1. Such defendant is hereby ORDERED substituted for defendant Richard Schweiker, pursuant to Fed.R.Civ.P. rule 25(d).

Olney Clowe, Buffalo, N.Y., Lewis Gol-
inker, New York City, for plaintiffs.

M. Susan Carlson, Dept. of Justice,
Washington, D.C., Peter Sullivan, Asst.
Atty. Gen., Buffalo, N.Y., for defendants.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

Plaintiffs in this class action challenging certain practices of the defendant Secretary of the United States Department of Health and Human Services ("the Secretary"), the Commissioner of New York's Department of Social Services ("the DSS"), and the director of the DSS's Bureau of Disability Determinations (more correctly, its Office of Disability Determinations) ("the ODD"), have moved for certification of a subclass of plaintiffs and for broad preliminary injunctive relief as to such subclass.

During the pendency of this motion the Court was informed that plaintiffs and the two State defendants—the DDS and the ODD—have agreed on the basic terms of a settlement of their dispute. Such settlement has been finalized and approved by the Court. Such settlement does not put an end to the plaintiffs' grievances with the Secretary due to the fact that procedural reforms adopted by the DSS and the ODD are not binding on the Social Security Administration ("SSA"). SSA could reject such voluntary reforms by refusing to reimburse ODD for the use of the new procedures, or by considering their use to be procedural errors when SSA is evaluating the performance of ODD. In addition, the settlement cannot provide relief to the class members who have already had their benefits wrongfully terminated by inadequate continuing disability investigations inasmuch as only SSA has the means to identify each such plaintiff. The settlement binds the DSS and the ODD to request such data from SSA but there can be no assurance that such will be forthcoming. These class members will only be able to be assured of any benefit from the settlement if this Court orders a reinstatement of benefits or a reopening of prior cessation decisions.

On August 12, 1982 and in response to plaintiffs' motion, I certified a class of plaintiffs consisting of

> "all persons who have been or will be found eligible for Title II disability insurance benefits and SSI [Supplemental Security Income] disability benefits and with respect to whom review of continuing disability has been or will be made by the New York State Department of Social Services [Office] of Disability Determinations pursuant to its agreement with the Social Security Administration without substantial medical evidence to show that their medical condition has improved since their original determination of disability to the point where he or she is able to engage in substantial gainful activity." Memorandum and Order 11.

The instant motion seeks to certify a subclass of plaintiffs consisting of present class members who are disabled by mental impairments on the ground that the latter assertedly experience unique hardship from the conduct of defendants' reviews of their eligibility for benefits.

The request for injunctive relief, set forth in full in the margin,[2] seeks to re-

---

**2.** The plaintiffs seek:

"(2) an order pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction requiring that defendants' procedures for notification of members of the subclass that continuing disability investigations ("CDIs") are to be performed ensure that no subclass member has his or her benefits terminated for 'failure to cooperate' unless the record contains substantial evidence that mailed notification, an in-person home visit, and other attempts at notification have been completed, and

that in fact, the benefits recipient has willfully failed to cooperate;

"(3) an order pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction requiring that defendants' procedures for evidence gathering or development in a CDI ensure:

(a) that requests for current evidence of disability [are] sent [to] all of [the] treatment and/or rehabilitative or other services identified by subclass members or others;

quire defendants to follow certain procedures in the conduct of defendants' Accelerated Continuing Disability Investigation ("ACDI") program, a term explained below. The procedures currently in use allegedly violate the subclass's rights under the Fifth Amendment and the Fourteenth Amendment, the Social Security Act and the Administrative Procedure Act, in that such procedures allow and have allowed the subclass's Social Security ("Title II") and Supplemental Security Income ("SSI")

benefits to be terminated without due process and without sufficient evidence of cessation of disability.

*Subclass Certification.*

■ Plaintiffs have moved for certification of a subclass consisting of members of the original class

"who have been or will be found eligible for Title II disability insurance benefits or SSI disability benefits due to a mental disability, in whole or in part, and with

(b) that requests for current evidence of disability shall be sufficiently tailored and precise to inform the reporting source of the type, extent, specificity and form of the information that is needed by defendants to make a CDI determination;

(c) that if the information reported by the treatment, rehabilitation or other sources is incomplete, not sufficiently detailed or is otherwise not in the form that is required by defendants to make a CDI determination, follow-up inquiries, consisting of specific requests for such information shall be made;

(d) that if the information defendants have requested is not received from the reporting source within a reasonable time, defendants shall provide written and telephonic notice to both the source(s) and to the subclass member that requested information has not been received, but still is needed;

(e) that if the information supplied by the reporting source(s) shows that a test, examination or procedure is needed to make a CDI determination but has not been previously performed, defendants shall request that one of the subclass member's reporting sources perform the needed test, examination or procedure;

(f) that defendants may request that a test, examination or procedure be performed by a non-treating consulting physician only if

(i) there are no reporting sources who can supply evidence of current disability about the subclass member; [or]

(ii) the reporting source(s) choose not to perform the needed test, examination or procedure; [or]

(iii) after notification to both the subclass member and the reporting source(s), requested information still has not been supplied and non-cooperation by the reporting source(s) is expected to continue; [or]

(iv) there is substantial, documented evidence that the subclass member's reporting source(s) are unreliable, inaccurate or not objective and written notice describing such evidence has been sent to both the subclass member and to the reporting source;

(g) that if defendants request that a test, examination or procedure relating to the existence or severity of a mental disorder be per-

formed on or for a subclass member by a non-treating consulting physician, the physician shall be a qualified psychiatrist;

(h) that before a test, examination or procedure relating to the existence or severity of a mental disorder is performed on or for a subclass member by a non-treating consulting physician, all information supplied to defendants by the reporting source(s) shall be provided to the consulting physician for review;

(i) that after a test, examination or procedure relating to the existence or severity of a mental disorder is performed on or for a subclass member by a non-treating consulting physician, but before a CDI determination is made by defendants, the consulting physician's report shall be provided to the subclass member's reporting source(s) for review and/or comment;

"(4) an order pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction requiring that defendants' procedures for evidence evaluation in a CDI ensure that after evidence development is complete, substantial weight shall be accorded to and defendants shall be bound by the findings of a subclass member's reporting source(s) concerning the existence and severity of a mental disorder, unless there is substantial evidence to the contrary;

"(5) an order pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction:

(a) voiding the benefits termination of all members of the subclass issued since the Accelerated CDI or "ACDI" program was begun in March 1981, that have not been reversed on subsequent appeal;

(b) directing defendants to notify and reinstate the full benefits of each of these subclass members;

(c) requiring that no subsequent benefits termination decisions shall be issued for these subclass members unless the procedures required by this Order are followed;

"(6) and such other and further relief as the Court may deem just and proper."

respect to whom review of continuing disability has been or will be made by the New York State Department of Social Services Office of Disability Determinations, pursuant to its agreement with the Social Security Administration."

I find that designation of such a subclass is appropriate in this action due to the unique due process considerations presented by the defendants' communications to and interaction with mentally impaired individuals. The disabling conditions burdening mentally impaired recipients well may hinder their ability to respond to notification that a CDI is to be performed, as well as their abilities to participate effectively in the CDI process and to exercise their right to appeal a determination by defendants that benefits are to be terminated. Fed.R. Civ.P. rule 23 provides sufficient flexibility to enable this Court to limit various types of relief to differing class members. *Shivelhood v. Davis*, 336 F.Supp. 1111, 1113 (D.Vt.1971). The subclass meets the numerosity requirement of rule 23(a)(1) in that plaintiffs estimate that there are approximately 160,000 individuals in the subclass; there are also common questions of law and fact as required by Fed.R.Civ.P. rule 23(a)(2) regarding the CDI procedures and their compliance with due process guarantees. Additionally, five of the ten named plaintiffs are mentally impaired and their claims are typical of those of the subclass, as called for by Fed.R.Civ.P. rule 23(a)(3). These representative parties will provide the fair and adequate protection of the subclass mandated by *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968), *vacated and remanded on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The designation of this subclass will permit me to address the separate preliminary injunctive relief sought on behalf of these individuals.

*Preliminary Relief.*

The plaintiffs' request for a preliminary injunction seeks a directive containing prohibitory and mandatory relief. First, plaintiffs ask for an order ensuring that no subclass member has his or her benefits terminated for "failure to cooperate" unless an in-person home visit and other attempts at notification have been completed. Second, an order relating to the CDI evidence development procedures is sought. Third, plaintiffs urge that defendants be bound by the findings of a subclass member's treating source concerning the mental disorder, unless there exists substantial evidence to the contrary. Finally, an order is requested voiding the benefits terminations and reinstating full benefits of all subclass members since the ACDI program began in March 1981, that have not been reversed on subsequent appeal.

The Secretary has, at the outset, raised several objections to this Court's exercise of jurisdiction over plaintiffs' motion for injunctive relief.

It is first urged that there is no basis laid in the Complaint for the relief requested in this motion in that the ACDI process was not implemented until March 1981, whereas the Complaint was filed in the previous year. However, the grievances regarding the ACDI process recited in plaintiffs' moving papers and supporting affidavits and briefs are mostly of the same kind as are recited in the Complaint, which assails the alleged practices of terminating benefits without adequate consultation of and reliance upon treating physicians and professionals and through excessive reliance upon examinations by consultative physician examiners. Importantly, the Complaint stresses the mental and emotional harm to plaintiffs of being subjected needlessly to cessation notices and the subsequent review process due to defendants' allegedly statutorily and constitutionally deficient standards and procedures. The Complaint is not so narrow as the Secretary urges; it is not confined to the allegation that termination decisions must be made only upon substantial *medical* evidence of cessation of disability, although such is a major focus of the Complaint. Plaintiffs' moving papers charge that there is a "cessation bias" intrinsic in the ACDI program as conducted, a matter not raised in the pre-ACDI Complaint, but such charge seeks to establish only the root cause of the subclass's grievances, which

grievances are of the same sort as those stated in the Complaint. The one grievance listed in plaintiffs' moving papers not mentioned in the Complaint is that defendants terminate benefits for recipients' "failure to cooperate" with review procedures prior to making appropriate efforts to ensure that recipients are aware of an ongoing review and that they are physically and mentally able to cooperate with the review procedures. Nonetheless, such grievance is within the scope of the Complaint's allegations of inadequate procedural protections and, in conformity with the directive of Fed.R.Civ.P. rule 8(f) that "[a]ll pleadings shall be so construed as to do substantial justice" and with modern notice-pleading concepts, ought to be deemed included in the Complaint. To force plaintiffs to undergo the empty exercise of amending their Complaint so as to support more explicitly their request for injunctive relief is in no one's interest.

■ The Secretary's second jurisdictional objection is to the effect that the proof of plaintiffs' claims raised on the motion for an injunction would necessarily involve examination by the Court of hundreds of individual case files in order to determine whether defendants are or are not complying with the procedures set by their own regulations "in all cases, or at least a large majority of cases." Such exercise assertedly would be contrary to *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), and other decisions holding that "individual review of [Title II and SSI benefit] determinations can be accomplished only through individual appeals pursuant to 42 U.S.C. § 405(g) and (h) after the full exhaustion of administrative remedies." Such contention, however, is so wholly contrary to the decision of the United States Court of Appeals for the Second Circuit in *Ellis v. Blum*, 643 F.2d 68 (1981), as not to require extended discussion. Even if it will be necessary, as the Secretary contends, to review many individual cases in order to determine the adequacy of her procedures, such will not be the sort of review of individual claims as to which 42 U.S.C. § 405(g) provides the exclusive jurisdictional basis, but will be merely an exami-

nation of evidence relevant to the overarching claim in this case, which examination is available under 28 U.S.C. § 1361 and *Ellis v. Blum*.

■ The Secretary's further contention that plaintiffs' request for reinstatement of benefits makes the injunction motion not "the type of solely regulatory challenge which the United States Court of Appeals for the Second Circuit has held are within the Court's jurisdiction pursuant to 28 U.S.C. § 1361" also has overlooked the ramifications of the *Ellis v. Blum* decision, wherein the court addressed this specific concern:

> "While it is true that the complaint did seek reinstatement of benefits for those members of the class who had been terminated without receiving a pretermination notice containing a statement of reasons and a summary of evidence, we are not convinced that a temporary reinstatement of benefits pending compliance with due process is the kind of recovery that Congress had in mind when it enacted [42 U.S.C.] § 405(h) in 1939. And in any event, we do not see much sense in making our jurisdiction depend upon a less thorough pleading of the relief desired." 643 F.2d at 82.

This passage means at least that the mere request for reinstatement of benefits does not make inappropriate the entertainment of plaintiffs' injunction request under 28 U.S.C. § 1361 and 42 U.S.C. §§ 405(g) and 405(h), as such request may be denied. Read "for all it's worth," the passage allows that an award of temporary reinstatement of benefits due to lack of due process in the termination thereof can be appropriate relief in class actions such as this.

■ It has been held that section 1361 mandamus jurisdiction is adequate for an award of liquidated sums wrongfully withheld by a federal official or agency if either of the latter has a duty of paying such sums to the claimant, (but not for awards of unliquidated sums in the nature of damages). *See, e.g., United States v. Commonwealth of Pennsylvania*, 394 F.Supp. 261, 265 (M.D.Pa.1975). If reinstatements

of benefits are appropriate in this case, the amounts involved may be considered "liquidated" in that such amounts are certain or definitely ascertainable through computation. The federal official or agency involved may be held to owe a duty of temporary reinstatement to the claimants involved if due process was denied in the termination of benefits. I conclude that under 28 U.S.C. § 1361, *Ellis v. Blum, supra,* and other judicial constructions of section 1361, this Court is authorized to order reinstatement by the Secretary of temporary benefits if otherwise appropriate.

During the pendency of the instant motion, the Secretary invited my attention to the recent decision of the United States Court of Appeals for the Second Circuit in *Smith v. Schweiker,* 709 F.2d 777 (1983). The Secretary asserts that the *Smith* ruling requires the dismissal of the instant action due to the lack of subject matter jurisdiction. However, a careful reading of the opinion reveals that subject matter jurisdiction does in fact exist in the instant action both as to the original class and as to the subclass now sought to be created.

In *Smith,* also a class action, the plaintiffs sought to challenge the Secretary's test of "current disability" and to require that medical improvement of the recipient be proven prior to a termination of benefits. The appellate court found that jurisdiction could not be based in that case on federal question jurisdiction (28 U.S.C. § 1331) or on mandamus jurisdiction (28 U.S.C. § 1361) or on a civil rights claim under 28 U.S.C. § 1343. In addition, the Court held that jurisdiction could not be premised on Title II of the Social Security Act, 42 U.S.C. § 405(g), inasmuch as those plaintiffs had not exhausted their administrative remedies. A waiver of the exhaustion requirement was not permitted in *Smith* because the criteria for waiver, as set forth in *Mathews v. Eldridge,* 424 U.S. 319, 330–31, 96 S.Ct. 893, 900–01, 47 L.Ed.2d 18 (1976), had not been satisfied. ■ In the instant action, a waiver of the exhaustion requirement is appropriate for the subclass of mentally impaired plaintiffs

and for the remaining class of physically disabled plaintiffs. In *Smith* the Court explained:

"A waiver of the exhaustion requirement may be inferred where the plaintiffs' legal claims are collateral to their demand for benefits, where exhaustion would be a *pro forma* or futile gesture, or where the harm suffered in the interim would be irreparable in the sense that no *post hoc* relief would be adequate."

Both the original class's and the subclass's due process and other procedural challenges are indeed collateral to their substantive claims of entitlement to benefits. As I previously found in my Order of August 12, 1981:

"Plaintiffs have clearly presented a colorable constitutional claim of denial of due process, all plaintiffs' claims are largely collateral * * * to the merits of the termination process, and, as to these plaintiffs, requiring exhaustion of administrative remedies would effectively close the door to a federal adjudication of these claims. *See, Califano v. Sanders,* 430 U.S. 99, 109 [97 S.Ct. 980, 986, 51 L.Ed.2d 192] (1977); *Mathews v. Eldridge,* 424 U.S. 319, 331 [96 S.Ct. 893, 900, 47 L.Ed.2d 18] (1976)." Memorandum and Order 7–8.

In addition, in the case at bar, each plaintiff has alleged serious mental and emotional trauma with consequent physical injuries due to defendants' allegedly defective review process. In *Smith,* by contrast, all of the named individuals had been re-classified as "currently disabled" and were in fact receiving benefits. That decision does not implicate the type of irreparable injury alleged in this action. Furthermore, plaintiff Schisler, now in the proposed subclass, and plaintiff Hilts of the original class, are presently not receiving benefits.

Finally, while curtailing mandamus jurisdiction, *Smith* did not totally eradicate this Court's mandamus jurisdiction in the case at bar. *Smith* stated that "[m]andamus jurisdiction does not lie where the claims are not against the Secretary for failure to

comply but rather are directed at the propriety of the regulations themselves." *Smith v. Schweiker, supra,* at 779. The instant plaintiffs have alleged a failure of the defendants to promulgate and issue guidelines regarding the review of disability beneficiaries, and additionally a lack of compliance with regulation 20 C.F.R. § 404.1594(a) and other rules. *See, e.g., Plaintiffs' Complaint,* ¶¶ 31–35. Thus, even under the *Smith* decision's limiting language, mandamus jurisdiction remains proper in the instant action for many of plaintiffs' assertions.[3]

The standard applicable here for granting preliminary injunctive relief was set forth in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70 (2d Cir.1979) (per curiam). The court explained that in order to obtain a preliminary injunction in this circuit, a party must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 72. The interim relief is to be fashioned to preserve the status quo, pending the final disposition of the action on the merits, and is clearly an extraordinary remedy. *Checker Motors Corporation v. Chrysler Corporation,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

In the instant action, plaintiffs are entitled to certain of the measures sought, yet do not meet the requirements for preliminary relief regarding other matters. I will address the plaintiffs' requests in the order that they are presented by plaintiffs' moving papers, as set forth earlier in the margin at footnote 2.

Defendants' ACDI program was instituted in response to the directive of Congress that

"[i]n any case where an individual is or has been determined to be under a disability, the case shall be reviewed by the applicable State agency or the Secretary (as may be appropriate), for purposes of continuing eligibility, at least once every 3 years * * *; except that where a finding has been made that such disability is permanent, such reviews shall be made at such times as the Secretary determines to be appropriate." 42 U.S.C. § 421(h)(1).

This directive, legislated in 1980 (Pub.L. 96–265, Title III, § 311(a), 94 Stat. 460), implemented Congress's conclusion that the then-current nonstatutory continuing CDI procedures were "inadequate and result in the continued payment of benefits to many persons who have medically or otherwise recovered from their disability." S.Rep. No. 408, 96th Cong., 2d Sess. 61 (Nov. 8, 1979), reprinted in [1980] U.S.Code Cong. & Ad.News 1277, 1339. Pursuant to subsection 311(b) of Pub.L. 96–265, the ACDI process was to be implemented beginning in January 1982. However, the federal defendant began implementation in March 1981, an appropriate exercise of discretion.

Consideration of plaintiffs' motion logically begins with a review of the statutory bases for the entitlements sought to be protected and for the defendants' challenged procedures.

Title II disability benefit awards are available to otherwise-qualified workers who are "disabled"—*i.e.,* unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 416(i)(1). The definition of disability for SSI purposes is identical, but being need-based rather than a worker's disability program, SSI benefits

---

**3.** *Wheeler v. Heckler,* 719 F.2d 595 (2d Cir.1983), creates no additional barrier to this Court's exercise of mandamus jurisdiction inasmuch as the appellate court did not question the district judge's determination that the *Ellis v. Blum* pre-

requisites for mandamus jurisdiction had not been satisfied. *See Wheeler v. Heckler, supra,* at page 598 n. 1, *aff'g in part and rev'g in part, Wheeler v. Schweiker,* 547 F.Supp. 599, 607 (D.Vt.1982).

extend also to children under eighteen suffering from "any medically determinable physical or mental impairment of comparable severity". (42 U.S.C. § 1382c(a)(3)(A)).

The obtaining of Title II and/or SSI benefits is accomplished through application to the SSA, on behalf of which the ODD solicits and evaluates evidence of claimants' physical and mental conditions and reaches an initial conclusion whether benefits claims should be allowed or disallowed. The ODD's initial determination is, in the case of Title II claims, subject to reconsideration by the ODD at a claimant's request and, after reconsideration, may upon demand be reviewed in a full evidentiary hearing before an SSA Administrative Law Judge ("ALJ") whose decision is further appealable to the SSA's Appeals Council and is thereafter subject to an action for review in a federal district court.

The instant motion concerns the processes by which a claim which has thereby been finally allowed is subject to subsequent review for determination whether benefits should be continued. More particularly, plaintiffs address the procedures by which defendants have assertedly been making initial determinations to cease benefits, allegedly without adequate notice to members of the proposed subclass or adequate consultation with their treating physicians and other professionals familiar with their disabling conditions. Such procedures are said not to be in compliance with the Secretary's own regulations, set forth in 20 C.F.R., Parts 404 (Title II) and 416 (SSI), or with the instructions provided by the Secretary for implementation by the ODD, set forth in a manual, the Program Operations Manual System ("POMS"). Plaintiffs assert that the actual procedures used fail to give the mentally impaired a meaningful opportunity to defend their entitlement to benefits and therefore such procedures do not provide members of the proposed subclass with due process of law.

There are three distinct time periods pertinent to the instant motion throughout which defendants' procedures varied materially. The first period is from March 1981, the inception of the ACDI program, to February 1982, at which time the state defendants implemented a "maximum assurance program" intended to raise the quality of cessation determinations (*Affidavit of Lloyd Moses,* Director, ODD, ¶ 7j). The second period spans from February 1982 to October 1982, at which time the SSA took over from the ODD the task of making the initial contact with individuals whose claims were being reviewed and began to require face-to-face interviews as the initial stage of the ACDI review process (*Affidavit of Harris G. Factor,* Director, Office of Operational Policy and Procedure, SSA, Exhibit 2; POMS § 504.005). The third period is from October 1982 until the present. However, these time periods do not have a bearing on the relief sought by plaintiffs and it is not necessary to subdivide further the proposed subclass according to the date of its members' respective CDI decisions.

It is appropriate also to consider the effect, if any, on the instant demand for injunctive relief of Pub.L. 97–455, §§ 2–5, 96 Stat. 2498–2500 (January 12, 1983). Section 2 of this law, codified at 42 U.S.C. § 423(g), provides in pertinent part for the elective continuation of Title II benefits for months after January 1983 pending an administrative hearing, subject to waivable recapture by the Secretary; the provision has a "sunset clause" terminating its effect as of June 1984. Section 3, codified at 42 U.S.C. § 421(h)(2), provides a means for the Secretary to alleviate on a state-by-state basis the burden imposed by the ACDI program upon state agencies, where the state is making good faith efforts to meet the staffing and review requirements. Section 4, codified at 42 U.S.C. § 405(b)(2), requires in pertinent part that reconsideration of Title II benefit awards be made only after opportunity for an evidentiary hearing "reasonably accessible to [the] individual." Section 5 requires that such face-to-face reconsiderations be conducted in a manner which assures that "beneficiaries will receive reasonable notice and information with respect to the time and place of reconsideration and the opportunities afforded to introduce evidence and be represented by counsel," and that beneficiaries

be advised "of the importance of submitting all evidence that relates to the question before the Secretary or the State agency at such reconsiderations."

The Secretary contends that these provisions, particularly those for continuation of Title II benefits pending an administrative hearing and for a reasonably noticed face-to-face evidentiary hearing in Title II termination proceedings,[4] effectively moot the demands for relief upon the motion for a preliminary injunction. However, as will appear, the plaintiffs' position that these changes do not totally address, either prospectively or retrospectively, the grievances that led to their request for preliminary injunctive relief has the greater merit.

Prior to the initiation of the face-to-face interview stage in September 1982,[5] the POMS-prescribed process for ACDI review of a Title II and/or SSI benefits recipient's present entitlement was basically as follows: the recipient was mailed a written notification that his or her continued disability was being investigated, together with a questionnaire asking for a self-assessment of his or her medical condition, a report of any employment activity and a listing of all sources of medical treatment and of other persons who could supply information about the recipient's present condition (hereafter collectively referred to as "treatment sources"); a Privacy Act waiver form on the questionnaire authorized the ODD to obtain information directly from treating sources; the notification warned that a failure to return the questionnaire could result in the termination of benefits; defendants' rules required that, if the questionnaire was not returned, an examination be made to determine whether the failure to respond was willful or wheth-

er a disabling mental impairment prevented the completion or return of the questionnaire (POMS § 2842(B)); the state defendants were directed to attempt to contact the recipient personally at home and to undertake all reasonable efforts to resolve this question; the issuance of a termination decision was authorized only after these efforts were exhausted and documented in the recipient's file.

The recipient was also required to cooperate and assist in the process of gathering evidence by submitting reports from treating sources and, upon request, by undergoing consultative examinations and tests. 20 C.F.R. § 404.1593. Defendants' rules stated that defendants would help the individual compile the information needed for the CDI determination. 20 C.F.R. § 404.-1512(b).

The defendants' information-gathering procedures, both in the past and presently, recognize the value of the treating sources' findings and direct that such information be obtained and utilized wherever possible. POMS §§ 2013(B)(3), 2023. "Tailored requests" for information are to be made so that all of the pertinent data can be provided by the treatment source. POMS § 2021 (A). In addition, follow-up requests are required where additional or more specific information is needed. POMS § 2023. The treating physician should also be utilized where further evidence is necessary, so long as such physician has cooperated in providing timely and complete reports. POMS §§ 2023, 2027(A), 2027(E).

The defendants' rules require that both the recipient and the treatment source be contacted if requested information has not been received. Assistance is ordinarily to

---

4. Even prior to the enactment of Pub.L. 97–455, SSI recipients had been accorded both a waivable continuation of benefits pending an administrative appeal of cessation determinations and, unlike Title II beneficiaries, had been entitled to an SSA hearing rather than reconsideration on papers by the ODD as the first stage of review of such determinations. 20 C.F.R. §§ 416.145, 416.336(b) (1982).

5. The Secretary's opposition to the instant motions has focused upon the procedures em-

ployed beginning with implementation of the face-to-face interview stage in September 1982. Despite efforts to do so, I have been unable to obtain a copy of the obsolete pre-September 1982 POMS cited by plaintiffs and therefore must rely upon plaintiffs' uncontroverted explanation of the pre-September 1982 process, as stated in plaintiffs' supporting memoranda and in the affidavit of ODD disability specialist Richard Rhoads.

be provided to the recipient in contacting the treatment source in order to obtain the sought report. 45 Fed.Reg. 55566, 55572 (Aug. 20, 1980) (explaining 20 C.F.R. §§ 404.1516, 416.916).

Plaintiffs allege that defendants' actual practices, in performing CDIs, did not and do not conform with either the letter or the spirit of their rules. They assert that home visits in "failure to respond" cases have not been conducted and are in fact indirectly discouraged. Plaintiffs state that defendants routinely fail to contact all treatment sources and that, when a source is reached, a superficial rather than a tailored inquiry is pursued. Plaintiffs blame defendants' "dual development" practice, in which medical evidence from treating sources and non-treating consultative examiners is simultaneously obtained, for many of the deficiencies in the evidence gathering process. The use of dual development allegedly results in detailed requests for information from the consultative examiner and not from the treating sources, a lack of follow-up inquiries to the treatment sources and a failure to notify the recipient and a source that requested data has not been received. Furthermore plaintiffs state that, contrary to policy, the consultative examiners are routinely used as a substitute for treatment source data and that the findings of these examiners are given equal or greater weight than the information supplied by treatment sources. Plaintiffs assert that the result of these evidence development practices has been the erroneous termination of the disability benefits of hundreds or thousands of mentally impaired individuals.

Defendants deny the allegations that home visits were not, and are not, being conducted in "failure to respond" cases. In addition, the Secretary points to the new procedure for initiating CDIs, effective October 1, 1982, which requires a face-to-face interview, rather than a letter to the recipient as the initial phase of the CDI review process. Defendants further assert that plaintiffs' other claims are equally unfounded and that plaintiffs' supporting affidavits fail to point to specific instances where proper procedures were not in fact followed.

Plaintiffs initially ask that defendants be ordered to refrain from terminating a subclass member's benefits for "failure to cooperate" unless certain procedural steps have been taken. Defendants assert that plaintiffs' request for an in-person home visit has been mooted by the aforementioned new procedure, wherein rather than a letter being sent by the state agency indicating that a response was required within ten days a letter is now sent to the recipient stating that he should come into the local office for an interview. Defendants state that, if the recipient cannot come into the office, other arrangements will be made to conduct the interview. However, defendants do not directly address the situation where a recipient totally fails to respond to the initial letter. While defendants' rules require that an attempt be made to contact personally a recipient who has failed to comply with a request for information, POMS § 504.325, plaintiffs claim that home visits and in-person contacts have not in fact been made. In addition, the temporary moratorium on CDIs for "functional psychotic disorders," imposed by the Secretary's statement of June 7, 1983, does not rectify any notification deficiencies regarding mentally retarded and other mentally impaired individuals.

It is beyond dispute that procedural due process protections apply to terminations of Social Security disability benefits. *Mathews v. Eldridge, supra* 424 U.S. at 332, 96 S.Ct. at 901. The holding in *Eldridge* that a full evidentiary hearing is not required prior to termination of benefits is not dispositive of the instant motion. The facts presented by plaintiffs' assertions of irreparable injury due to the mental anguish and deterioration of subclass members' conditions caused by erroneous terminations differentiates this matter from the one before the Court in *Eldridge.* Moreover, *Eldridge* explicitly recognized that due process requires that "procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances

of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." 424 U.S. at 349, 96 S.Ct. at 909 (citing *Goldberg v. Kelly*, 397 U.S. 254, 268–269, 90 S.Ct. 1011, 1020–1021, 25 L.Ed.2d 287 (1970)). In the case at bar, the defendants' CDI notification procedures have not been tailored to the capacities and circumstances of mentally impaired recipients.

Plaintiffs have presented sufficient documentary proof to support a finding of probable success on the merits and possible irreparable harm. The defendants too have, as noted, recognized that certain subclass members having functional psychotic disorders are prone to being terminated incorrectly (*HHS Fact Sheet*, June 7, 1983, at 4) and it is apparent that other subclass members, by virtue of their mental impairments, may be unable or unwilling to respond to the defendants' initial letter requesting an interview. Plaintiffs also assert that the required home visits or other in-person contacts have not been performed due to the time pressures of the ACDI program. See *Rhoads Affidavit*, ¶¶ 10–13. In addition, plaintiffs have provided evidence that improper terminations for failure to respond can result in irreparable harm in the form of exacerbation of symptoms, re-hospitalization, homelessness and even suicide. *See, e.g., Social Security Disability Benefits Terminations: New York, Hearing before the Subcomm. on Retirement Income and Employment, House Select Comm. on Aging*, 97th Cong., 2d Sess. (July 19, 1982); and C. Bellamy, *Passing the Buck: Federal Efforts to Abandon the Mentally Disabled*, New York City Council, January 1982 (hereinafter "C. Bellamy, *Passing the Buck*").

▆▆▆▆ Plaintiffs are entitled to a preliminary order directing that, before a cessation for failure to cooperate or failure to respond may be issued, a home visit or other in-person contact be conducted to determine whether the recipient is unwilling or unable to respond. Furthermore, the cessation of benefits shall not be permitted where the unwillingness to cooperate is in fact attributable to the mental impairment of the recipient. In such cases, the defendants must make an effort to contact family members or health services sources of the individual, in order to obtain the information necessary to conduct the disability investigation.[6] The ordering of such a procedure is in accord with *Eldridge*'s balancing of factors test, employed to determine whether a particular procedure should be required. The factors to be considered are

"[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge, supra*, 424 U.S. at 335, 96 S.Ct. at 903.

Members of the subclass have an important interest in their mental health and their attempts at rehabilitation. The risk of erroneous deprivation is high due to the substantial possibility that a failure to cooperate may be caused by the disabling mental impairment and due to the large number of CDIs being performed in a short period of time. The probable value of these additional safeguards is the added assurance that benefits will not be terminated, causing added psychological problems to the individual, due to a recipient's inability to respond to the CDI notification or to provide pertinent information because of the disabling impairment. The additional administrative burden is small in light of defendants' new procedure requiring a face-to-face interview at the beginning of

---

**6.** It should be noted that the general rule against granting preliminary injunctive relief on the basis of affidavit evidence is inapplicable where, as in the instant action, the parties do not demand an evidentiary hearing. *See Semmes Mo-* *tors, Inc. v. Ford Motor Company*, 429 F.2d 1197–1205 (2d Cir.1970); *Zenith Laboratories, Inc. v. Eli Lilly and Co.*, 460 F.Supp. 812, 814 (D.N.J.1978).

the CDI process and the directive contained in POMS § 504.325 that personal contact be attempted in instances where the recipient fails to furnish information.

It should also be noted that section 2 of P.L. 97–455 which permits persons whose entitlement to benefits has ceased to elect to continue receiving benefits until their appeal to an ALJ is decided, does not rectify the problem for which this preliminary relief is being granted. That section of the law responds only to the financial impact of a termination decision and not to the adverse mental health impact on subclass members caused by summary cessations without adequate notice.

■ Plaintiffs next seek relief regarding the CDI evidence accumulation procedures. Most of plaintiffs' grievances in this area state that defendants fail to comply with their own established rules. For the most part, the desired order would mandate compliance with defendants' published procedures. Plaintiffs' supporting documents establish a likelihood of success on the merits on certain points to be discussed below and my order shall direct defendants to comply with these stated regulations as required by law.

Plaintiffs have presented statements indicating that defendants commonly fail to contact all treatment sources when gathering evidence, in contravention of POMS § 2013 and § 2023. (*Affidavits of Golinker* ¶¶ 7–8; *Link* ¶¶ 29–30; and *Murphy* ¶¶ 8–11). While defendants deny these allegations, they cannot seriously object to an order directing compliance with their own rules, POMS § 2023 and § 2025. Therefore the preliminary order shall grant plaintiffs' request that informational inquiries be sent to all treatment and/or rehabilitative services identified by the subclass members. (Request (3)(a) as designated in plaintiffs' moving papers.)

Similarly, plaintiffs' request (3)(b), that information requests be sufficiently tailored to inform the reporting source of the type and extent of evidence sought, is required by POMS § 2021(A) and § 2025(A) and shall be included in the preliminary order. A sufficient showing has been made that tailored requests have often not been made. (*Ko Affidavit* ¶ 5.)

Plaintiffs' request (3)(c), that specific follow-up inquiries be made, is mandated by POMS § 2023 and § 2025(B). Defendants will be ordered to follow the directives of the regulations in this respect also, as plaintiffs have demonstrated a variance from the established rules. (*Rhoads Affidavit* ¶ 19).

■ In request (3)(d) plaintiffs ask that defendants provide written and telephonic notice to the subclass member and the source when information desired from a treating source has not been received. While such a procedure might well result in the information being eventually produced and therefore a more complete and accurate determination, this procedure is outside the scope of defendants' present rules and will not be ordered at this stage of the present litigation. Such relief would exceed the preliminary injunction's purpose of preserving the status quo.

Request (3)(e) essentially asks that defendants be ordered to comply with POMS §§ 2023 and 2027(D)(3) by utilizing the treating source to perform any additional required test or examination. Defendants are directed to follow these rules where the treating source is available and has been found to be cooperative. Similarly, request (3)(f) seeks compliance with the instructions in POMS §§ 2023 and 2027(D)(4) regarding the circumstances when a non-treating consulting physician should be used to perform tests and/or examinations. I will order defendants to observe these instructions.

Plaintiffs ask in request (3)(g) that defendants be ordered to utilize a qualified psychiatrist to perform any test, examination or procedure relating to a mental disorder, where a non-treating physician's services are required. Plaintiffs point to an instance where an anesthesiologist was used to perform a mental status examination. (*Murphy Affidavit* ¶¶ 12–16). I direct the defendants to abide by the rule in POMS § 2027(D)(2) that the doctor selected to perform a consultative examination or

test be competent and have the training and experience to perform the examination or test required. Additionally, defendants will be ordered to comply with the mandate of POMS § 2027(E)(2) that the pertinent medical evidence be supplied to the consulting physician prior to the examination, as plaintiffs urge in request (3)(h).

Request (3)(i) urging that consultative reports be provided to the treatment source for review and/or comment, like request (3)(d), embodies a procedure beyond the current requirements of defendants' rules. Such relief would be inappropriate at this point in that plaintiffs have not demonstrated that they will probably be entitled to such relief eventually and that the lack of such a procedure has increased the risk of irreparable harm caused by wrongful terminations.

In request (4), plaintiffs ask that defendants be bound by the findings of a subclass member's treating source concerning the extent of the mental disorder, unless there is substantial evidence to the contrary. This request is denied for lack of a meeting of the requirements for a preliminary injunction. The request is inappropriate for preliminary relief as it really entails the ultimate relief sought and plaintiffs have not as yet demonstrated a substantial likelihood of success on this point.

Similarly request (5), asking that all benefit terminations of subclass members be voided and for a directive reinstating benefits, seeks the very relief that plaintiffs would obtain by a final judgment in their favor. The function of a preliminary injunction is to preserve the status quo pending trial and it is improper to issue preliminary relief that would effectively provide the relief sought in the Complaint. *Diversified Mortg. Investors v. U.S. Life Ins. Co.*, 544 F.2d 571, 576 (2d Cir.1976); *Heldman v. United States Lawn Tennis Association*, 354 F.Supp. 1241, 1249 (S.D. N.Y.1973). However, plaintiffs have sufficiently demonstrated that due process requires a home visit or an interview with the mentally impaired recipient prior to a cessation based upon a failure to respond or to cooperate. While many of the subclass members who had their benefits terminated did in fact receive such procedural protections, it is apparent that many subclass members were possibly wrongfully terminated without a home visit or other in-person contact. *See* C. Bellamy, *Passing the Buck*, at 17–18; *Campobasso-Meyer Affidavit* ¶¶ 12–14; *Soper Affidavit* ¶¶ 8–10; *Rhoads Affidavit* ¶¶ 11–13; and *Bellamy Affirmation* ¶¶ 4, 7. As explained above, the denial of such a procedure can be crucial to the final determination because the failure to respond may stem from the recipient's mental impairment. Additionally, the continued denial of benefits has been shown to cause irreparable harm by impeding rehabilitation and in fact causing deterioration of the fragile mental status of the subclass member. In another class action by mentally impaired individuals, *Mental Health Assoc. of Minnesota v. Schweiker*, 554 F.Supp. 157, 166 (D.Minn.1982), it was similarly found that terminations resulted in disruption of physician-patient relationships, deteriorations of medical conditions, inability to pay for essential medications, and agitation, and that these harms were irreparable. Therefore, rather than ordering a full reinstatement of benefits at this juncture, the defendants will be ordered to reopen the cessation decisions of all subclass members where benefits were terminated for failure to respond or to cooperate. In any case where a home visit or in-person contact was not in fact performed, such procedure will be ordered to be conducted unless there is documented in the file evidence that a family member or health services representative was contacted on the individual's behalf and was able to provide the sought information. In instances where the in-person contact did not take place and the aforementioned persons were not contacted to act on the recipient's behalf, the home visit will be ordered to be conducted and the defendants will be ordered to re-examine the previous cessation decision in view of the observations made and information received from the individual or, where the individual is unable or unwilling to cooperate due to the nature of the mental impairment, the defendants will

be ordered to contact either a family member or health services source of the individual in order to obtain the information needed for an accurate CDI decision. In gathering evidence for the final decision, defendants will be directed to comply with the within Order's instructions regarding compliance with the defendants' rules.

These requirements of ensuring an in-person contact and assisting in the compilation of information are consistent with the defendants' duty to take special notice of a recipient's impairment which can effectively disable him from substantiating his claim. *See Cullison v. Califano,* 613 F.2d 55, 58 (4th Cir.1980). In addition, the public interest does not disfavor issuance of a preliminary injunction against precipitous shifting of financial responsibility for the psychiatrically disabled. Moreover, defendants' notification procedure jeopardizes the public policy favoring de-institutionalization of those mentally impaired individuals who can be accorded such status. *See Mental Health Assoc. of Minnesota v. Schweiker, supra,* at 167. The administrative burden will not be too great as defendants assert that home visits were routinely attempted after Commissioner Blum's directive of February 5, 1982.

For these reasons, it is hereby

ORDERED that plaintiffs' motion for certification of a subclass of individuals consisting of members of the original class is granted and that such subclass shall be composed of individuals

who have been or will be found eligible for Title II disability insurance benefits or SSI disability benefits due to a mental disability, in whole or in part, and with respect to whom review of continuing disability has been or will be made by the New York State Department of Social Services Office of Disability Determinations pursuant to its agreement with the Social Security Administration, or who have been or will be reviewed initially by the Social Security Administration under more recent procedures;

and it is hereby further

ORDERED that (1) the Secretary and her respective officers (including the Commissioner of the Social Security Administration and the Commissioner of the New York regional office of the Social Security Administration) and their agents, servants, employees and all other persons in active concert or participation with them or any of them who receives actual notice of this Order by personal service or otherwise (hereinafter "their agents") are restrained and enjoined, pending further order, from terminating the benefits of a subclass member for failure to respond or to cooperate unless and until a home visit or other in-person contact has taken place; (2) cessation of benefits shall not occur where the unwillingness to cooperate is attributable to the mental impairment of the recipient unless and until said defendant and her agents shall have made a further effort and shall have contacted a family member or health services treatment source of the impaired individual in order to obtain the medical, psychological, or other information necessary for the continuing disability investigation; (3) said defendant and her agents shall issue written instructions to all federal and state regional offices within New York State that are involved in continuing disability investigations directing that in developing evidence for a continuing disability investigation determination:

A. all medical, psychiatric and psychological treatment sources of the recipient be sent informational inquiries, as required by POMS §§ 2013 and 2023;

B. the requests to such treatment sources shall be sufficiently tailored to inform the source of the type and extent of the information sought, as required by POMS §§ 2021(A) and 2025(A);

C. specific follow-up requests shall be made to the treatment sources where additional or more detailed information is needed, as required by POMS §§ 2023 and 2025(B);

D. the treatment sources shall be used to perform any required additional test or examination where such source is available and has been cooperative, as required by POMS §§ 2023 and 2027(D)(3), and the instructions in POMS §§ 2023 and 2027(D)(4) regarding the use

of a non-treating consulting physician shall also be strictly complied with;

E. the doctor selected to perform a consultative test or examination shall be competent and have the training and experience required to perform the particular test or examination, as instructed by POMS § 2027(D)(2);

F. prior to any test, procedure or examination, the non-treating consulting physician shall be provided with copies of the pertinent existing evidence regarding the recipient's condition, as required by POMS § 2027(E)(2);

(4) said defendant and her agents shall reopen and cause to be reopened the cessation decisions of all subclass members where benefits were terminated for failure to respond or to cooperate or a similar reason indicating an unwillingness to cooperate or provide information and shall determine whether a home visit or in-person contact was conducted prior to the termination decision and, in cases where such a procedure did not occur, shall direct that a home visit or in-person contact be utilized or that a family member or health services treatment source of the recipient be contacted in order to determine the reason for the failure to respond or cooperate and shall then complete the continuing disability investigation determination, unless the defendants shall determine that the initial failure to respond or to cooperate or similar basis for termination was in no manner attributable to a mental or physical impairment, without penalization of recipients who have improved to the point where they can now respond and cooperate yet were unable to cooperate previously due to their condition at the time of the initial notification.