**Trueman RICE, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, and Cesar A. Perales, Commissioner of the State of New York Department of Social Services, Defendants.**

No. 83 Civ. 5424 (MEL).

United States District Court, S.D. New York.

July 31, 1986.

John E. Kirklin, Director of Litigation, The Legal Aid Society, Civil Appeals & Law Reform Unit, New York City, Marshall Green, Attorney-in-Charge, The Legal Aid Society, Bronx, N.Y., for plaintiff; Nancy Morawetz, New York City, Ian Feldman, Bronx, N.Y., of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Elizabeth Dusanewskyj, Asst. Regional Counsel, Department of Health and Human Services, New York City, for defendant Margaret Heckler; Jonathan A. Lindsey, Paul K. Milmed, Asst. U.S. Attys., of counsel.

LASKER, District Judge.

On July 21, 1983 Trueman Rice filed this Social Security action on behalf of himself and other New York residents who, pursuant to 42 U.S.C. § 1382c(a)(3)(E) (1976), had been " 'grandfathered' into the [Supplementary Security Income ("SSI")] program on January 1, 1974 because they had been recipients of benefits under the State of New York's Aid to the Disabled Program."

As the Court of Appeals for this Circuit recently explained in *Wheeler v. Heckler*, 719 F.2d 595 (2d Cir.1983), the classification of certain SSI recipients as "grandfatherees" arises from Congress' enactment in October 1972 of the "Supplemental Security Income for the Aged, Blind and Disabled" program, 42 U.S.C. §§ 1381 *et seq.* (1976). The purpose of the new law was to

unify the various federally funded state disability programs then in existence by establishing a national standard for disability. *Id.* at 597. In addition, to protect the rights of individuals who previously were determined to be disabled under state standards that were more favorable than the new federal standard, Congress enacted a "grandfather clause," pursuant to which

> an individual shall also be considered to be disabled for purposes of this subchapter if he is permanently and totally disabled as defined under a State plan approved under Subchapter XIV or XVI of this chapter as in effect for October 1972 and received aid under such plan (on the basis of disability) for December 1973 (and for at least one month prior to July 1973), so long as he is continuously disabled as so defined.

42 U.S.C. § 1382c(a)(3)(E).

The gravamen of the complaint in this action is that plaintiffs' SSI benefits have been discontinued without it first being determined that they are no longer disabled under the standards of the "Aid to the Disabled" program, the New York State program that was in effect in October 1972.

■ In addition to challenging the alleged failure to apply the New York programs' criteria, the complaint alleges (1) that the Secretary of Health and Human Services ("the Secretary") failed to notify the plaintiff and the class that their impairments would be evaluated under both the State and federal programs' criteria; (2) that 20 C.F.R. §§ 416.907 and 416.994 have been promulgated in violation of the Administrative Procedure Act because Sections 416.907 and 416.994 do not provide for review under the Aid to the Disabled Act's standards and (3) that the Secretary's failure to gather appropriate evidence and

evaluate plaintiffs' claims under the State criteria violates plaintiffs' right as intended beneficiaries of the contract between the Secretary and the Commissioner of the State of New York Department of Social Services by which the Commissioner makes the determinations of disability for purposes of SSI eligibility.[1]

In addition to seeking declaratory relief on the basis of the violations alleged above, plaintiffs[2] seek reinstatement of their benefits and an injunction prohibiting the Secretary from discontinuing their benefits

> for purported medical reasons without (1) determining whether their impairments have improved to the extent that they are no longer disabled under the Aid to the Disabled program's disability criteria, (2) sending the class members notices that inform them that their impairments will be evaluated under the Aid to the Disabled program's disability criteria, and (3) securing the class members' medical records on which the decisions were based that they were disabled under New York's Aid to the Disabled program's disability criteria.

Subsequent to the filing of the complaint several judicial or legislative developments have occurred which are relevant to plaintiffs' cause of action. First, in *Wheeler v. Heckler*, 719 F.2d 595 (2d Cir.1983), the Court of Appeals for this Circuit has held that grandfatherees must be evaluated under the appropriate state standard regardless of the difficulty in ascertaining the state criteria:

> The grandfather provision, section 1382c(a)(3)(E), unambiguously provides that those previously determined to be eligible for disability benefits are to remain eligible if they satisfy the substantive standards of either current federal

---

1. The complaint also alleges that the decision denying Trueman Rice benefits was not based upon substantial evidence. Since the Secretary voluntarily remanded Rice's case in December, 1983 and his benefits have been reinstated, Rice's individual claim is moot.

2. Although no class has been certified in this litigation since the claims which are the subject of the motion are the class claims, and since Rice's individual claims are moot, we will refer to "plaintiffs" (plural) throughout this Memorandum.

law[3] or the state law in force as of October 1972.

*Id.* at 600.

Second, the Social Security Disability Benefits Reform Act of 1984, Pub.L. 98–460, 98 Stat. 1794 (1984) ("Reform Act") was enacted on October 9, 1984. The Reform Act establishes a new medical improvement standard for evaluating continued disability[4] and provides that members of medical improvement classes that have been certified before September 19, 1984 are eligible for review under the Reform Act's new criteria.[5] The Reform Act further provides that claimants whose cases are remanded may elect to receive interim benefits.[6]

Third, in *Schisler v. Heckler*, 80 Civ. 572 (W.D.N.Y.), a medical improvement class action in the Western District of New York, *see Schisler v. Heckler*, 574 F.Supp. 1538, 1541 (W.D.N.Y.1983), an order was entered on December 3, 1984, which clarified the scope of a class that had been certified on August 12, 1982. *See Schisler v. Heckler*, 107 F.R.D. 609 (W.D.N.Y.1984), *aff'd in part, rev'd in part on other grounds*, 787 F.2d 76 (2d Cir.1986). It is evident from the amended order that the plaintiffs in this litigation are members of the *Schisler* class. Moreover, since the class was originally certified before September 19, 1984, the class members, including the plaintiffs in the instant litigation, have had their cases remanded to the Secretary for readjudication pursuant to the Reform Act.

Finally, at various times throughout the litigation, the parties in this case have explored the possibility of settlement. At least partially as an outgrowth of the negotiations, in the Spring of 1984, the Secretary issued two amendments to the Social Security Administration Office of Hearings and Appeals Handbook ("the Handbook"), "Section 1–351–53" and "Appendix C," together with a Social Security Administration Program Circular ("the Program Circular"). The amended Handbook contains the Secretary's description of the disability provisions of the approved state plans which were in effect for October 1972, and requires notice of the evaluation process to be sent to all grandfatherees. The Program Circular provides that cessation notices sent to grandfathered SSI recipients must indicate that their individual impairments were evaluated under both federal and state criteria.

### Mootness

The Secretary moves to dismiss the complaint on the grounds that the "unique circumstances occasioned by the passage of the Reform Act," (pursuant to which the plaintiffs are entitled to have their claims readjudicated) and the actions taken by the Secretary, have made plaintiffs' claims moot.

Plaintiffs respond that the complaint, insofar as it alleges claims unrelated to medical improvement,[7] should not be dismissed

---

**3.** Under the current federal criteria the standard for determining disability is that

> An individual shall be considered to be disabled ... if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months....

42 U.S.C. § 1382c(a)(3)(A) (1982).

**4.** Social Security Disability Benefits Reform Act of 1984, ("Reform Act"), Pub.L. 98–460, § 2(a).

**5.** Reform Act § 2(d)(6) defines "action relating to medical improvement" as

> ... an action raising the issue of whether an individual who has had his entitlement to

benefits under Title II, XVI or XVIII of the Social Security Act based on disability terminated (or period of disability ended) without consideration of whether there has been medical improvement in the condition of such individual (or another individual on whose disability such entitlement is based) since the time of a prior determination that the individual was under a disability.

*See also* Reform Act § 2(d)(3).

**6.** Reform Act § 2(e).

**7.** The parties agree that insofar as plaintiffs' claims relate to medical improvement they are no longer in issue because plaintiffs are entitled to have their claims reevaluated as members of the class certified in *Schisler v. Heckler,* 574 F.Supp. 1538, 1541 (W.D.N.Y.1983).

because "the relief [the Secretary] has implemented provides no assurance whatsoever of retroactive relief to persons who received inadequate notice" and "her new instructions continue to provide for inadequate notice and standards in grandfather cases."

Under the law, this litigation is moot only if

(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations.

*County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted).

In this case, whether the claims are moot depends largely upon whether the Secretary's new procedures provide for the correct application of the New York State standards.

The parties agree that the New York State plan that was in effect in October 1972 is contained in a publication of the New York State Department of Social Services called Manual Bulletin 173 ("the Manual Bulletin" or "the Bulletin"). The Secretary's new instructions for reviewing grandfatherees' cases may be found in Section 1–351–53 of the Office of Hearings and Appeals Handbook and Interim Circular No. 186. *See also* 20 C.F.R. § 416.994(d) (1986). The Secretary's version of the New York State criteria is also contained in the Social Security Administration's Program Operations Manual System ("the POMS"). In discussing the components of the Secretary's new instructions the parties primarily refer to the POMS.

Although plaintiffs challenge the adequacy of the new guidelines, their initial brief did not indicate in what manner the new instructions failed to comply with the law. Accordingly, after studying plaintiffs' brief and hearing argument on the motion, the Court requested that the plaintiffs supplement their earlier submissions with statements setting forth with particularity the alleged deficiencies of the new instructions.

Subsequent rounds of submissions, further requests for specific statements of alleged inadequacies, and further argument on the motion have narrowed the dispute to the following issues: (1) whether the Secretary's plan is inadequate because it does not provide for a social worker to be part of the review team; (2) whether the Secretary's instructions are deficient because they fail to include certain items which are contained in the Manual Bulletin (the New York State publication containing the 1972 Aid to the Disabled program's criteria); (3) whether the form used by the Secretary to obtain information relevant to the eligibility determination is incomplete; and (4) whether the Secretary's combined actions provide adequate assurance that plaintiffs' claims will be reviewed under state law criteria. Each subject is discussed below.

### A.

Plaintiffs' primary challenge to the adequacy of the Secretary's new instructions is that the federal version of the State plan that is contained in the Program Operations Manual (POMS) does not require a social worker to be a part of the review team. Plaintiff argues that, although The New York State Department of Social Services now employs persons with the title of "Disability Analyst," in 1972, New York used social workers. Plaintiffs further maintain that social workers are necessary to evaluate properly the impact of the social factors on the recipient's impairments and ability to work, as the New York State plan requires.

The Secretary answers that the New York State plan does not require the use of social workers, that failure to include social workers on the review team is not a substantive deviation from the state criteria, and that there is no evidence that Disability Analysts cannot adequately evaluate non-medical factors in disability determinations.

The question of whether the composition of the review team is a substantive component of a state plan was considered in *Wheeler v. Schweiker,* 547 F.Supp. 599, 609

(W.D.N.Y.1982), *rev'd on other grounds,* *Wheeler v. Heckler,* 719 F.2d 595 (2d Cir.1983). In *Wheeler,* the District Court concluded:

> The manner in which the Vermont AD plan administrators organized their review teams was procedural only, and forms no part of a State plan definition of disability which the defendants are bound by 42 U.S.C. § 1382c(a)(3)(E) to apply to "grandfatherees." As defendants rightly point out, the adoption of the unique procedural aspects of the various State plans would be inconsistent with the evenhanded administration of the SSI program throughout the country. Congress, in creating the Supplemental Security Income program, intended to create "a single Federal program." H.R. Rep. No. 93–672, 93d Cong., 1st Sess. (1973), *reprinted in* U.S.Code Cong. & Ad.News 3177, 3183. To require each SSI grandfatheree's continuing eligibility for benefits to be judged according to the State procedures under which he or she was first found disabled would result in fifty-one separate SSI programs. In our mobile society, the Secretary could be burdened with administering all or most of these programs side-by-side even within one state, to evaluate "grandfatherees" who have changed their state of residence since first found disabled. Nothing in 42 U.S.C. § 1382c(a)(3)(E) or its legislative history compels this result.

547 F.Supp. at 609.

On appeal, the Second Circuit Court of Appeals remanded the case for the District Court to more fully ascertain the Vermont State plan requirements. *Wheeler v. Heckler,* 719 F.2d at 601. However, the Court of Appeals did not disturb the District Court's conclusion that the makeup of the review team is merely procedural. The Secretary argues that the District Court's reasoning in *Wheeler* is applicable to the instant action.

Although we find the *Wheeler* rationale to have substantial merit, if the decision is meant to hold that the review team's composition can *never* create a situation where there is a substantive deviation from a state plan's criteria, we would disagree. For example, a review team which did not have *any* person on it who was capable of assessing non-medical factors might well be considered a substantive deviation from the State plan. Nevertheless, absent such a gross deviation from state plan procedures or substantial evidence indicating that the makeup of the team inherently results in the misapplication of state law criteria, composite differences in the review team do not rise to the level of a substantive departure from the State plan.

In this case, however, the Manual Bulletin itself appears to indicate that only the functional equivalent of a degreed social worker (as opposed to an actual degreed social worker) is required to be part of the review team. It is true that, on the one hand, the definitional section of the Bulletin provides that:

> Review Team means technically competent persons, not less than a physician and *a social worker qualified by professional training and pertinent experience,* ... who are responsible for the agency's decision that the applicant does or does not meet the State's definition of permanent and total disability, based on the evaluation of the medical report and social history.

Manual Bulletin at 6 (emphasis supplied).

On the other hand, the portion of the Manual Bulletin entitled "Guide for Determining Disability in Aid to the Disabled Program" explains:

> Disability is a complex concept. It is usually progressive and affects each individual in a different manner. It cannot be determined as simply or in the same way as, for example, age. This is the reason for the Federal and State requirement that the determination of the eligibility factor of disability be made by technically competent persons acting cooperatively—not less than a physician plus *a social worker and/or persons of other disciplines who are qualified by*

*training and experience*—who are known as the review team.[8]

*Id.* at 65 (emphasis supplied).

■ Moreover, the facts which plaintiffs point to as demonstrating that disability analysts are not the functional equivalent of social workers are not persuasive. Although disability analysts are not required to have a degree in social work, they are required to be either college graduates or registered nurses who have passed the civil service examination and have undergone two years of training which involves four months of classroom training, including medical lectures and training by experienced analysts, and then on-the-job training under close supervision with regular evaluations during a probationary period.

In sum, the failure to include on the review team individuals with a social work degree is not a discrepancy from the State plan of such magnitude as to be deemed to be a substantive deviation.

Plaintiffs next argue that, "[i]n addition to the social worker requirement, there are other provisions in the New York plan in the Manual Bulletin that amplify the POMS version of the plan and give it 'a more refined meaning'." They list the following as examples of instances in which the Manual Bulletin is more detailed: (1) in determining whether to classify a person as a homemaker, the Manual Bulletin provides that the review team "must try to relate the limitation imposed by the disability to what is required of the homemaker in carrying out responsibilities to other members of the household" and makes clear that men can be classified as a "homemaker;" (2) the Manual Bulletin asks for the observations of a worker about whether a recipient "is hopeful or depressed; constantly complains or is optimistic about the future; tries to help himself or is dependent; seems to have made a normal adjustment to his disability or overemphasizes or

minimizes it;" and (3) the Manual Bulletin classifies as disabled on medical grounds alone a person who has been in a training program for two years "and is still unable to engage in a useful occupation existing in the community or is not working full time in the sheltered workshop at the prevailing wages in the community."

The Secretary maintains that each of the quoted portions to which the plaintiffs refer is in substance already included in the "POMS or otherwise contained in the SSA's 'Report of Continuing Disability Interview' form." According to counsel, the Social Security Administration is nevertheless willing to distribute the complete Manual Bulletin to each regional office of the New York Disability Determination Service and to each SSA Hearing Office, with instructions that the Bulletin should be used as a reference to amplify the State plan as it now appears in the POMS.

Before commenting on the alleged deficiencies in the POMS, two matters should be noted. First, although plaintiffs argue that the new POMS should be "more refined," they do not contend that the Secretary's new guidelines are inconsistent with the State criteria. Second, in evaluating the adequacy of the POMS we start from the proposition that, while the Secretary's description of the State plan must of course be accurate, the Secretary is not required to use the identical language of the Manual Bulletin. Indeed, plaintiffs concede that the Manual Bulletin is "duplicative [and] verbose" and capable of being pared down to a more manageable form.

■ Turning to an evaluation of the two versions of the State plan, the plaintiffs' assertion that the Manual Bulletin is more elaborate than the POMS is not without merit. The following example is illustrative.

---

**8.** We note that the federal regulations provide for a review team including a "social worker qualified by professional training and pertinent experience." 45 C.F.R. § 233.80(a)(2). The language in the Manual Bulletin and the State's own current use of "Disability Analysts" appears to indicate that New York does not regard this provision as requiring an individual with a college degree in sociology as opposed to a person with "social work" training and experience. We do not understand plaintiffs to be challenging the State's failure to comply with this regulation.

As previously indicated, the New York plan requires the review team

> to relate the limitations imposed by the disability to what is required of the homemaker in carrying out responsibilities to other members of the household.

The POMS incorporates the substance of this requirement by providing, *inter alia*, that in determining whether an applicant is permanently and totally disabled (in relation to the issue of homemaker)

> consideration must be given to the individual's total environmental situation. Inadequate housing, lack of labor saving equipment, and other conditions such as no bathing or inside toilet facilities, the need to build fires, carry wood, coal, water from outside or upstairs, to wash clothes by hand, lack of hot running water, the number of persons in the household, the size of the house, the distance of markets, etc., are all factors which require more hours of work and increased physical exertion.

Regarding the fact that a "homemaker" may be male or female, each version of the plan at some point refers to a female in giving an abbreviated description of a homemaker. The Manual Bulletin and the POMS both state:

> Only those individuals, *such as housewives*, who were engaged in this occupation prior to the disability and who do not have a history of gainful employment are to be evaluated as homemakers (emphasis supplied).

In the detailed description of a homemaker the Manual Bulletin specifies, however, that "Section Vb—Homemaker"

> applies only to those patients, *male or female*, who are responsible for the care of at least one person as well as the care of the home in which they reside (emphasis in the original).

The POMS on the other hand, uses the gender neutral phrase "any person" in its description of homemaker, neither explicitly stating that a homemaker may be male nor suggesting that it must be a female.

The differences between the POMS' and the Manual Bulletin's provisions on home-making exemplify the nature of the distinctions that appear in comparing other sections of the two documents, namely, that the POMS is not inconsistent with the State plan, that it substantially incorporates the essence of the State criteria, but that it does not provide the specificity found in the Manual Bulletin. Accordingly, if the Secretary intended to rely solely on the POMS' version of the New York plan it could not be concluded without further exploration that the POMS does not contain any substantive omissions. However, distributing the *complete* Manual Bulletin, as the Secretary suggests, if accompanied by clear instructions incorporating the two documents, would be sufficient to overcome any inadequacies in the POMS' specificity.

It is true that merging the material currently in the POMS with the "amplifications" which plaintiffs suggest would result in a clearer presentation of the material and might provide at least some additional assurance that no provision would be overlooked by an adjudicator. However, the Court of Appeals for this Circuit has recently stated, *see Berger v. Heckler*, 771 F.2d 1556, 1578–80 (2d Cir.1985), and reiterated, *see Schisler v. Heckler*, 787 F.2d 76, 84 (2d Cir.1986), that courts should avoid unnecessary intrusion into the administrative process. It is doubtful that a federal court has any more authority to order the Secretary to put instructions in a particular form than it does to order her to use certain language in promulgating a regulation. *See Berger v. Heckler*, 771 F.2d at 1578 (modifying the district court's order requiring the Secretary to promulgate regulations to implement a consent decree because "the court overstepped its authority when it required that certain language be contained in the regulation.")

Plaintiffs argue as a further component of their "insufficient amplification" assertion that the Secretary's continuing disability information form is not an adequate substitute for the social information form used under the New York plan. They contend:

The [State] plan's form has questions to evaluate a recipient's homemaking abilities; the Secretary's form does not. The plan's form has questions to evaluate a recipient's education; the Secretary's form has questions only about schooling since the disabling benefits began. The plan's form asks whether the recipient has a mental, emotional, drug, or drinking problem; the Secretary's form asks for information about disabling conditions.

Letter of plaintiff's counsel dated October 1, 1985 at 4.

■ The propositions relating to the form stand in a somewhat different posture than the challenges to the POMS' description of the State criteria. The New York plan does provide for the use of a social information form but its use as an information gathering device is predominantly procedural in nature. The plaintiffs do not suggest, nor do we find, that the contents of the Secretary's form misstate the relevance of information or otherwise misconstrue the purpose or necessity of any type of data. Contrary to the plaintiffs' assertion, the Secretary's form adequately elicits the relevant material despite the more general manner in which the questions are phrased.

For instance, as to "homemaker abilities," the Secretary's form requires applicants to

Describe your daily activities in the following and state what and how much you do of each, how often you do it and any assistance you require.

. . . .

Household maintenance (including cooking, cleaning, shopping, and odd jobs around the house as well as any other similar activities.)

Nor does the fact that the Secretary's form inquires about disabling conditions generally, and not whether, specifically, the recipient has "mental, emotional, drug or drinking" problems, mean that the form cannot be used to record that information. Completion of the form must be guided by the State plans' definition of "disabling conditions" when review is being conducted in accordance with the Aid to the Disabled program criteria. Stated another way, the State standard establishes what goes in the form; the form does not establish the State criteria.

With regard to the educational information, the plaintiffs are correct that the Secretary's form asks only about schooling since the disabling benefits began. However, it is difficult to perceive in what manner this is less favorable to the recipient than the State's form since the practical result of limiting the question in this regard can only be that the Secretary's form records *less* education than the recipient may actually have. Moreover, the form is primarily used to evaluate a claimant's *continuing* disability by providing updating material to the educational and other unchanged information already on file. In sum, the form does not effect a substantive deviation from New York's program criteria in a manner which distributing the Manual Bulletin would not rectify.

■ Plaintiff's final argument in opposition to the Secretary's claim that the litigation is moot is that a POMS transmittal on processing decision review cases under the new medical improvement regulations (Transmittal No. 9) provides evidence that, contrary to the Secretary's assertions in support of the motion to dismiss, plaintiffs will *not* be reevaluated under the State plan criteria. In marshalling the new "evidence" of the Secretary's alleged continuing refusal to properly evaluate grandfatherees, plaintiffs point to the POMS instructions which state:

"[A] decision review is not a current [continuing disability review]. This is a new one-time category of cases which requires special processing,"

A00510.101.A, and to the lack of any mention of evaluations under the State plan in the POMS instructions' list of issues that must be considered in a replacement decision rationale. *See* A00510.115.B and A00510.150, Exh. 2.

The Secretary responds that plaintiffs have completely misconstrued the transmittal letter. She contends that,

[t]he principal POMS transmittal on the application of the new medical improvement review standards to continuing disability reviews—including reviews in cases remanded from the district courts—is Transmittal No. 28, dated January 1986.... Transmittal No. 28 makes it absolutely clear that in the case of grandfatherees the [Medical Improvement Review Standard] *will be considered* with respect to the appropriate State plan criteria, if it is determined that benefits cannot be continued under federal criteria (including the MIRS). *See* Transmittal No. 28 at A00401.812.D and A00401.880).[9]

Letter of Paul K. Milmed, Assistant United States Attorney (Feb. 12, 1986) (emphasis in original).

The Secretary's characterization is an accurate assessment of Transmittal 28 as we read that document. Moreover, we find nothing in Transmittal 9 which indicates that it is meant to supercede or otherwise negative Transmittal 28's instructions requiring application of the New York State criteria.

### B.

Before considering the question of mootness as it relates to the above conclusions, three further claims that are alleged in the complaint but which have not been significantly discussed in the plaintiffs' brief are addressed below.

First, the complaint alleges that the Secretary failed to give adequate notice that grandfatherees' claims would be evaluated under State, as well as federal criteria. Although plaintiffs argued in the initial brief in opposition to the motion that the relief the Secretary has implemented provides no assurance whatsoever of retroactive relief to persons who received inadequate notice, and that the new instructions still do not provide for adequate notice, despite two requests for "particulars" by the court, plaintiffs have not explained how

---

**9.** Transmittal No. 28 at A00401.812.D states:
D. Nonrollback Conversion Cases
In cases in which the individual was a title XVI grandfatheree and is receiving title XVI payments based on disability, disability can be ceased only when the individual's impairment(s) as shown by medical or other evidence does not meet the Federal criteria (DI A00401.807ff.) and does not meet the criteria of the appropriate State plan (see DI A00401.-880). The Federal criteria (including medical improvement and its exceptions) will be considered first. The MIRS will then be considered again with respect to the State plan criteria.
Transmittal No. 28 provides at A00401.880:
Special Cases
A00401.880 Nonrollback Conversion Cases
The guides in DI 00401.880 apply only to title XVI cases in which the recipient was previously found disabled under a State plan, and a decision of cessation would be made if the decision were based solely on the Federal criteria in DI A00401.807–DI A00401.812. Disability will be ceased only when the individual's impairment(s) as shown by medical or other evidence does not meet the Federal criteria (DIA00401.807ff.) and does not meet the criteria of the appropriate State plan as outlined in DI 00401.880 and DI 00701.001ff. The Federal criteria, including MI and its exceptions, will be considered first.

If it is determined that benefits cannot be continued under the Federal criteria (including the MIRS), the State plan criteria will then be considered. Application of the State plan criteria will include another consideration of the MIRS. In a consideration of MI issues in the context of the State plan criteria, the comparison point will be the time of the most recent prior medical decision granting or affirming disability entitlement under the State plan. In many cases this comparison point will be different from the one used in considering MI issues under the Federal criteria. Evaluation under the State plan will include consideration of the issues of MI, relating MI to ability to work, and the exceptions to MI. This evaluation will generally follow the evaluation steps set out in DI A00401.811A, and will include as many of those steps as are relevant under the specific State plan being considered. For example, if the State plan includes some type of vocational criteria, those criteria would be considered after application of the MIRS.
In some cases, it may be difficult or impossible to locate the evidence considered in making the most recent prior medical decision affirming or granting disability entitlement under the State plan. In such cases, the lost folder instructions in DI A00401.813 should be applied.

they continue to be injured from the past lack of notice or in what manner the new notice provisions continue to be insufficient.

■ Even assuming that plaintiffs previously received insufficient notice, any past effects of the omission will be remedied under the Reform Act, pursuant to which, as members of the *Schisler* class, plaintiffs may elect to receive interim benefits while they are awaiting their readjudication.

In addition, the new instructions in several places provide that claimants are to be notified that their claims will be evaluated under both federal criteria and the criteria of the New York State plan, and that a copy of the State plan may be obtained by contacting their local hearing office. For example, the instructions to the hearing officer state:

> In summary, when the issues include cessation of disability for an SSI "grandfatheree" claimant, it is necessary (1) *to include as an attachment to the Notice of Hearing a reference to when a claim will be considered under the criteria of a State plan;*[10] (2) to proffer a copy of the pertinent portions of the appropriate State plan to the claimant or representative, and enter a copy into the hearing record as an exhibit; and (3) to evaluate the claimant's impairments in the context of the appropriate State plan if the claim-

ant is found not disabled under the Federal criteria. (OHA Handbook §§ 1–351–53 ff. discuss additional procedures to follow in these cases, and Appendix C of the OHA Handbook contains copies of the State plans.)

Interim Circular No. 186 (June 25, 1985). In sum, there is no basis for concluding that any past omission has not been adequately redressed.

A second claim raised in the complaint but not mentioned in the plaintiffs' brief is that 20 C.F.R. §§ 416.907 and 416.994 were promulgated in violation of the Administrative Procedure Act because they do not provide for review under the Aid to the Disabled program criteria.

However, the Social Security Administration proposed rules in April 1985 regarding the disability review process which incorporated a direction that grandfatherees are to be evaluated under the appropriate state standards. *See* 50 Fed.Reg. at 18443 (1985). Subsequent to the submission of the papers in this motion an amended rule which contains such instruction has been adopted. *See* 20 C.F.R. § 416.994 (1986). The language of the newly adopted rule is set forth in the margin.[11]

Finally, the complaint alleges that the Secretary failed to gather appropriate evidence to evaluate plaintiffs' claims under the State criteria. The Secretary asserts

---

10. "Attachment A" provides:

ATTACHMENT TO NOTICE OF HEARING SECTION 1614(a)(3)(E) OF THE SOCIAL SECURITY ACT MAY APPLY TO YOUR CASE If you became entitled to benefits under Section 1614(a)(3)(E) of the Social Security Act because you were found to be disabled under a State plan, we will first evaluate your condition under the Federal criteria for disability. If we do not find that your disability continues under the Federal criteria, we will then evaluate your condition under the appropriate State plan. If we do not find that your disability continues under the State plan criteria, we will find that your disability has ended. You or your representative may obtain a copy of the State plan criteria by contacting this Hearing Office.

11. 20 C.F.R. § 416.994(d) (1986) provides:

(d) *Persons who were found disabled under a State plan.* If you became entitled to benefits

because you were found to be disabled under a State plan, we will first evaluate your impairment(s) under the rules explained in paragraph (a), (b), or (c) of this section. We will apply the same steps as described in paragraph (a), (b), or (c) of this section to the last decision granting or affirming entitlement to benefits under the State plan. If we are not able to find that your disability continues on the basis of these rules, we will then evaluate your impairment(s) under the appropriate State plan. If we are not able to find that your disability continues under these State plan criteria, we will find that your disability ends. Disability will be found to end the month the evidence shows that you are no longer disabled under the criteria in paragraph (b) or (c), of this section (or appropriate State plan criteria), subject to the rules set out in paragraphs (b)(6) and (c)(6) of this section.
[50 FR 50137, Dec. 6, 1985; 51 FR 7063, Feb. 28, 1986]

that the Social Security Administration obtained all available records concerning conversion cases in 1975, and that to the extent medical records utilized by New York State in connection with any grandfatheree's original disability determination were available from the State at that time, they were obtained and placed in the individual's file at the Social Security Administration. Since plaintiffs do not challenge the accuracy of this statement nor otherwise brief the issue, we assume the truth of the proposition is conceded.

### C.

■ The question remains whether plaintiffs' claims are moot. The first condition that must be met to establish mootness, namely, that "it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur," *County of Los Angeles v. Davis*, 440 U.S. at 631, 99 S.Ct. at 1383 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)), has been satisfied. The law clearly requires the application of state criteria. The Secretary has acknowledged this requirement, and in addition to stating an intent to follow the mandates of the grandfather clause, the Secretary has on her own initiative (and in the absence of a court order) promulgated new rules and instructions pertaining to reviews under state plans. Under the circumstances, there is no reasonable basis to expect the Secretary to ignore the rules and instructions which required time and expense to issue or to conclude that judicial intervention is necessary to ensure that they are effectuated.

■ The second condition of mootness is that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* In this case, we have concluded that the Secretary's incorporating the Manual Bulletin into the POMS would adequately address plaintiffs' challenges to the Secretary's in-

structions, and that the notice provisions are sufficient. Accordingly, if the readjudications had already begun we would be satisfied that the second condition of mootness would have been met. However, to our knowledge, the Manual Bulletin and memorandum have not yet been distributed and reviews using the new procedures have not started. Therefore, at this time it cannot be said with certainty that the effects of the alleged violations have been completely eradicated. Nevertheless, the Secretary has indicated her willingness to take action, and implementation of such measures as providing the Bulletin would not seem to be time-consuming. Moreover, it appears that the readjudications are imminent. Accordingly, the motion to dismiss is granted under the condition that the Secretary submit competent proof that the Manual Bulletin and memorandum have been distributed and the reviews are well underway.

### D.

Plaintiffs moved for class certification on November 7, 1983. We conclude, without ruling on the merits of the motion, that the issue is moot since, assuming the conditions specified above, the complaint will be dismissed.

#### Attorneys' Fees

Plaintiffs filed a motion for class certification on November 7, 1983. In addition to opposing the motion on the grounds of failure to meet the requirements of Fed.R. Civ.P. 23, the Secretary cross-moved ("the 1984 motion") on April 4, 1984 [12] to dismiss the complaint on the ground that the class claims had become moot. The Secretary made essentially two arguments: (1) that "[t]he federal defendant has recently issued instructions to all agency adjudicators concerning consideration of claimants under the State plan," and (2) that there was no longer a "live" claim because the Secretary had earlier agreed to remand the named plaintiff's (Trueman Rice's) case for

12. The length of the period between the filing of the class certification motion and the Secretary's response in opposition was due in part to

the fact that the parties were engaging in settlement negotiations.

readjudication and Rice's benefits had in fact been reinstated.

In response to the 1984 motion to dismiss plaintiffs argued that there was reason to doubt that the new regulations had been issued. In addition they pointed out that the Secretary had failed to cite any of the relevant Second Circuit case law on the effect of the mootness of the named plaintiff's claim on a motion for class certification.

By letter dated January 21, 1985 the Secretary voluntarily withdrew the 1984 motion.

Plaintiffs move pursuant to Fed.R.Civ.P. 11 for attorneys' fees in compensation for the time which was expended in responding to the 1984 motion, and for the time spent preparing the instant motion for fees. They contend that attorneys' fees should be awarded because the Secretary's brief in support of the 1984 motion misrepresented facts and misstated the law.

Regarding the alleged factual misrepresentation, the Secretary concedes that the new instructions were not issued until April 23 and May 30, 1984, i.e., after the 1984 motion was filed but while it was still *sub judice.* Nonetheless, the Secretary argues that the factual error was not so unreasonable as to warrant the imposition of fees. She explains that, as is often true, the first draft of the brief was prepared by the Assistant Regional Attorney employed by the Office of General Counsel at Health and Human Services ("HHS"). The initial draft stated,

> Secondly, although plaintiff has rejected the federal defendant's settlement offer proposing to issue instructions to all agency adjudicators concerning consideration of claimants under the State plan, *such instructions will nonetheless be issued.*

*See* Affidavit of Jonathan Lindsey (Apr. 22, 1985) ("Lindsey Aff.") (Exhibit 1) (emphasis supplied).

The draft was subsequently reviewed and revised by an Assistant United States Attorney ("the Assistant") who changed the brief to read as quoted above, namely,

> "The federal defendant *has recently issued instructions....*" (Emphasis supplied).

The Secretary admits that she cannot now reconstruct exactly how the change in language came to be made. However, the affidavit of the Assistant states that his regular practice during the five and one-half years that he has been an Assistant United States Attorney is

> not [to] make a substantive change in a factual assertion in a brief—particularly one drafted by an agency attorney—unless that attorney or someone else at the agency specifically advised that such a change was warranted.

Lindsey Aff. at ¶ 7. The affidavit goes on to suggest that there was a misunderstanding between the Assistant and the attorney at HHS, *id.* at ¶ 8, and states further that the covering page of the instruction in issue which contains a reference to a March 1, 1984 "release date"

> may have contributed to the mistaken conclusion one month later that the instructions had been "issued" to adjudicators, when in fact they had only (in the parlance of the agency) been "released."

*Id.* at ¶ 9.

### A.

■ Rule 11 requires an attorney to make "reasonable inquiry" to establish that a "pleading, motion or other paper" is "well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law...." Fed.R.Civ.P. 11.

Here, although a more diligent investigation would have resulted in a more accurate statement of the new instruction's issuance date in the Secretary's brief, in view of the fact that the instructions were issued imminently, the Secretary's actions in this case do not warrant Rule 11 sanctions. Indeed, the "misstatement" in this case ceased being inaccurate shortly after the brief was filed. Moreover, although Rule 11 does not appear to *require* a finding of subjective bad faith before fees may be imposed, bad faith is not irrelevant to

the consideration. *See Friedgood v. Axelrod,* 593 F.Supp. 395, 397 (S.D.N.Y.1984). There is no evidence that counsel in this case acted purposefully to mislead either the plaintiffs or the court.

Finally, any added effort which plaintiffs expended as a result of the short-lived inaccuracy was de minimis since the issuance of the instruction ultimately had to be addressed in response to the Secretary's subsequent motion.

### B.

Nor are attorneys' fees warranted on the basis of the Secretary's legal argument in the 1984 motion. The Secretary there argued that the plaintiffs' case was moot because Rice's claim was settled, and that the case did not fit into the "capable of repetition yet evading review" exception to the general principle of mootness. However, the Secretary failed to cite Second Circuit decisions which have addressed the effect of mootness on a named plaintiff's case following a motion for class certification.

Clearly the Secretary's brief would have been more dependable if the line of Second Circuit cases which discuss the mootness issue in the class action context had been cited. However, in considering whether to impose sanctions based upon an allegedly incorrect legal theory it is appropriate to consider the complexity of the area of jurisprudence under discussion. *See Leema Enterprises, Inc. v. Willi,* 582 F.Supp. 255, 257 (S.D.N.Y.1984). Here, as the Secretary correctly observes, the area of law regarding mootness and class certification is "difficult, complex and evolving." Further, the general proposition of law set forth in the Secretary's brief was not incorrect. While a more prudent approach would have been to attempt to distinguish the various relevant Second Circuit decisions, the Secretary's handling of the matter, which, in effect, put the burden on the plaintiffs to establish that this case

fit into one of the exceptions carved out of the general mootness rules, does not reach the level of Rule 11 unreasonableness.

### Conclusion

For the foregoing reasons the motion to dismiss the complaint is granted,[13] and the motion for class certification is denied, on the conditions set forth above. Plaintiffs may move to reinstate the case and for renewal of the class certification motion in the event the Secretary fails to comply with the conditions underlying the complaint's dismissal. The motion for attorneys' fees is denied.

It is so ordered.

---

**13.** The Secretary's additional argument that the claims are not ripe is not considered since the